[Cite as *State v. Cutlip*, 2022-Ohio-3524.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## BELMONT COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

BENJAMIN CUTLIP,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 21 BE 0032**

---

Criminal Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No.  20 CR 226

**BEFORE:**
Carol Ann Robb, Gene Donofrio, David A. D'Apolito, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. J. Kevin Flanagan*, Belmont County Prosecutor, *Atty. Daniel P. Fry,* Assistant Prosecuting Attorney, 52160 National Road, St. Clairsville, Ohio 43950 for Plaintiff-Appellee and

*Atty. Edward F. Borkowski, Jr.*, P.O. Box 609151, Cleveland, Ohio 44109 for Defendant-Appellant.

Dated:  September 30, 2022

**Robb, J.**

**{¶1}** Appellant, Benjamin Cutlip, appeals his two convictions for aggravated drug trafficking following a jury trial in the Belmont County Court of Common Pleas. Appellant raises six assignments of error on appeal. He contends the trial court erred by overruling his motion to suppress, denying his motion for a mistrial, and answering a jury question. Appellant also asserts his convictions are against the manifest weight of the evidence and not supported by sufficient evidence and that he was denied the effective assistance of trial counsel. For the following reasons, we find the trial court erred based on the way it answered the jury question but that the error was harmless. The remainder of his assigned errors lack merit, and as such, we affirm Appellant's convictions.

## Statement of the Case

**{¶2}** Appellant was indicted by the grand jury in September of 2020 and charged with three offenses: (1) aggravated trafficking in drugs, methamphetamine a Schedule II drug in an amount that meets or exceeds 100 times the bulk amount, a first-degree felony in violation of R.C. 2925.03(A)(2) and 2925.03(C)(1)(f) with a major drug offender specification and a forfeiture of money specification; (2) aggravated possession of drugs, methamphetamine, a first-degree felony in violation of R.C. 2925.11(A) and 2925.11(C)(1)(e) with a major drug offender specification; and (3) aggravated trafficking in drugs, methamphetamine, a third-degree felony, in violation of R.C. 2925.03(A)(1) and 2925.03(C)(1)(c) with a forfeiture of money specification.

**{¶3}** Appellant failed to appear for his initial arraignment, and a warrant for his arrest was issued. He was eventually arraigned September 16, 2020 and plead not guilty. Appellant's initial trial counsel, a public defender, moved to withdraw to avoid a conflict because that office had previously represented the confidential informant who would testify against Appellant. (September 21, 2020 Motion to Withdraw.) Appellant's new attorney, who represented him for the duration of the trial court proceedings, was then appointed. (September 22, 2020 Judgment.)

**{¶4}** After the exchange of discovery, Appellant moved to suppress all evidence seized by the state's search warrant. (September 28, 2020 Motion to Suppress.) He later

supplemented this motion to suppress arguing a lack of probable cause to issue the search warrant. (December 11, 2020 Supplement to Defendant's Motion to Suppress.)

{¶5} The trial court conducted a joint suppression hearing in Appellant's case with a companion criminal case involving Melanie Brado, who was evidently also charged as a result of the same search warrant and seizure of the same evidence. Appellant and Brado were in a romantic relationship. Although the suppression hearing was consolidated, all other proceedings were separate.

{¶6} The suppression hearing was held December 14, 2020. The trial court overruled the motion to suppress and Appellant's motion to dismiss the charges via one judgment. The court held the judge who issued the search warrant had a substantial basis for concluding that probable cause existed to justify the issuance of the search warrant. The trial court also found the search warrant was not overly broad; it was issued soon after a controlled drug buy at that same location; and the scope of the warrant reasonably included the camper and all containers therein which could have contained the items to be searched for, i.e., cash, illegal drugs, drug paraphernalia, and cellular phones. (January 27, 2021 Judgment Entry.)

{¶7} Appellant's trial was held May 27, 2021 through June 2, 2021. The jury found him guilty of all charges. The following is a summation of the evidence presented at trial.

{¶8} Officer Michael Duplaga, a police officer with the city of St. Clairsville, conducted a traffic stop on July 3, 2020 of Zackary Durbin. Durbin was driving on a suspended license, and Duplaga found drug paraphernalia in his car. Durbin indicated he did not want to go to jail, so in order to secure leniency, Durbin offered to work as a confidential informant. Durbin completed one undercover transaction for Duplaga before he agreed to work as an informant regarding Appellant. Durbin had evidently met Appellant while they were in jail together. (Trial Tr. 307-309.)

{¶9} Durbin initially contacted Appellant via Facebook Messenger before the two exchanged phone numbers. Then Durbin began texting Appellant. Durbin took screenshots of the text exchanges with Appellant and forwarded them to Duplaga. Appellant was out of town at the time of the initial text messages, but returned a day or

so later and told Durbin to come to a camper. (Trial Tr. 315-322; state's exhibits 13, 14 & 15.)

**{¶10}** The police gave Durbin money to purchase drugs, and they recorded the serial numbers of the bills to trace them. (Trial Tr. 329.) The officers also gave Durbin a key fob recording device that recorded audio and video of the controlled drug purchase from Appellant. During the transaction, one police officer was stationed across the street from where the camper was located and another officer, Officer Weyand, followed Durbin to the location. Durbin purchased 3.46 grams of methamphetamine, or one "ball" for $200 from Appellant. Appellant can be heard in the audio recording also offering to sell Durbin "four balls for seven," meaning $700. (Trial Tr. 341-343; 363-364; 719; state's exhibit 12 & 12A.)

**{¶11}** During the video, Durbin can be heard using methamphetamine with Appellant, and Appellant tells him not to tell anyone where he got the drugs. But Appellant also can be heard saying he would sell to Durbin, who could then sell to his friends at work. (Trial Tr. 381-384.) The $200 the police provided to Durbin was later found in a locked bag inside the camper that contained $3,700. It was under a pillow on the bed. (Trial Tr. 397-398.)

**{¶12}** Durbin testified he had been abusing drugs since high school and he became addicted to heroin after high school. In order to feed his addiction, he acknowledged stealing to get money to buy drugs. He had approximately four convictions for theft, which he confirmed during his testimony. (Trial Tr. 576-582.)

**{¶13}** He recalls being stopped in St. Clairsville for driving on a suspended license on July 3, 2020, when he already had several other pending criminal charges. So, he told Officer Duplaga he could assist the police in exchange for leniency or dismissal of the new charges. Durbin first lined up a drug purchase from a female, which he successfully completed. Thereafter, one of the officers mentioned Appellant's name. Durbin told officers he would try to contact him. Because Durbin did not have his number, he messaged him on Facebook, which led to them texting one another. (Trial Tr. 588-590.)

**{¶14}** Durbin's texts with Appellant were admitted at trial. They depict the two discussing meeting after Durbin is done working and after Appellant returned from a

Case No. 21 BE 0032

casino. Appellant indicated he was waiting to hear from another person before he could return. The texts end with Durbin stating he will be done working at eight, and Appellant tells him to call him when he returns to St. Clairsville. (State's exhibits 44, 44A, 44B, 44C, 44D & 44E.)

{¶15} Durbin went to the camper with the recording device, and they eventually went inside where Cutlip weighed the drugs and sold 3.46 grams of methamphetamine to him. (Trial Tr. 607-610.) Durbin gave the money to Appellant, and he weighed the bag in front of Durbin. Durbin eventually left the camper and met Weyand down the road at a gas station where Durbin handed over the drugs.

{¶16} Durbin readily acknowledged benefitting from his cooperation with the police and recalls a certain criminal charge against him was dismissed as a result, but he could not remember which one since he had several pending at the time. (Trial Tr. 614-616.)

{¶17} The video of the transaction does not actually show Appellant handing Durbin the drugs or taking the money from him. (Trial Tr. 422.) Nevertheless, it is clear the two men are discussing the use and sale of illegal drugs for the majority of their interaction. It is also evident both men were using drugs during this time, and the one man, who is purportedly Appellant, can be heard touting the quality of what he was selling and the weight of what he was selling is better than others.

{¶18} During the recording, Appellant can also be heard saying he was selling because he wanted to "get rich." A man can also be seen wearing plaid shorts throughout the video, who the state claimed is Appellant. Appellant can later be seen in the search warrant body camera video wearing what appears to be these same shorts. (State's exhibit 29; defense exhibits C, B1 & B2.)

{¶19} Melanie Brado was present during the transaction, and another woman was also there at the beginning, named Robin Brown. However, Brado's interaction with Durbin was quite limited, and it sounded like she was not in the same room with them for the majority of the recording. (State's exhibit 29.) Brado was evidently also charged with drug trafficking as a result of this drug buy. She was also charged for another transaction occurring about three weeks later on July 30, 2020, which resulted in the seizure of $3,460 in allegedly illegal contraband money. (Trial Tr. 499-501.)

Case No. 21 BE 0032

**{¶20}** The defense tried to get Duplaga to admit the text message exchanges could have been faked or with another individual, but Duplaga disagreed indicating the references to the casino in the texts by Appellant were consistent with his statements during the recordings. Further, Duplaga noted the racial slurs used in these texts and made by Appellant in the audio recordings were similar. (Trial Tr. 511-513.)

**{¶21}** David Wise owned the recreational vehicle (RV) site where the camper was parked, and Wise recalls renting one of his sites to Appellant and Brado. Wise believed Appellant was the owner of the camper based on his conversations and interactions with him. (Trial Tr. 215-222.)

**{¶22}** During the search of the camper after the controlled drug buy, drugs were found in a locked safe, which contained 209.25 grams of methamphetamine. The safe was found under the mattress. Weyand also found a prescription pill bottle with Appellant's name on it inside a bedroom drawer. (Trial Tr. 467-469.) Drugs were also found in another safe, a locked backpack, and other places throughout the camper.

**{¶23}** Rachel Keaton, a forensic scientist with BCI, testified there were no latent fingerprints viable for analysis based on the items submitted to her. (Trial Tr. 251-277.)

**{¶24}** Keith Taggart, also a forensic scientist with BCI, [the Ohio Attorney General's Office, Bureau of Criminal Identification] testified he worked in the drug chemistry section. During his testimony, Taggart verified he tested and weighed each baggie and confirmed the weights of each. He also analyzed the contents of each baggie and confirmed each contained methamphetamine, a Schedule II drug, as detailed in his report. Taggart was asked about each of the 12 evidence items listed in his report and verified the weight of each substance in each container and confirmed the results of his analysis. These containers were found to contain more than 400 grams of methamphetamine. (Trial Tr. 542-543.)

**{¶25}** He also explained anything over three grams of methamphetamine is considered bulk amount, and thus, he confirmed if a particular statute called for more than 100 times bulk amount, then the weight of the drug in grams would have to meet or exceed 300 grams. (Trial Tr. 543-544.)

**{¶26}** State's exhibit 23 is the Ohio Bureau of Criminal Investigation laboratory report prepared by Taggart. It identifies 12 evidence bags and lists the corresponding

findings for the contents of each. His report concludes that more than 30 baggies containing a crystalline substance were found to contain methamphetamine. (State's exhibit 23.) State's exhibit 12, containing 3.46 grams of methamphetamine, was the quantity Durbin purchased from Appellant. (Trial Tr. 425.)

{¶27} During cross-examination, Taggart agreed the names of Appellant, Brado, and Brown were all listed on his report and the evidence bags, and these individuals were all named suspects. (Trial Tr. 547.)

{¶28} At the conclusion of Taggart's testimony, both counsel and the trial court judge discussed the total weight of the drugs tested and admitted in front of the jury, and the court indicated the weight of the substance in state's exhibits one through eight totaled approximately 428.01 grams. This is in addition to the 3.46 grams from state's exhibit 12, for a total of approximately 431.47 grams for all of the containers found to contain methamphetamine. (Trial Tr. 527-530; state's exhibit 23.) The state agreed the court's calculation of the total weight of the substance was consistent with Officer Duplaga's testimony as well. The court then indicated in light of that total weight, he asked whether either attorney had additional questions for Taggart, and neither did. Defense counsel did not object to the court's addition of the weight of the total substance and did not contradict the weight of these exhibits with other evidence. Counsel then stipulated, consistent with Taggart's testimony, when dealing with methamphetamine, "bulk amount" per the applicable statute is three grams. (Trial Tr. 547-550.)

{¶29} Officer Duplaga testified he relayed the quantities of the drugs seized per the search warrant and explained where in the camper each amount was located when found by the police. He also described in detail how they found certain quantities packaged in baggies for sale, which was verified via the state's exhibits, including photographs of the drugs and money seized as well as the BCI report. (Trial Tr. 647-654; state's exhibits 17,19, 23 & 28.)

{¶30} Officer Weyand also testified. He works for the county drug task force and aided in the investigation. Weyand explained on the night of the controlled drug buy, he provided Durbin with the recording device and $400 to purchase drugs. The money was photocopied to document the serial numbers. He then followed Durbin to the scene of the transaction and waited nearby in an unmarked car. Thereafter, Weyand met Durbin

at a gas station and secured the drugs he purchased and remaining money from Durbin. Weyand also retrieved the key fob recording device, which was played during trial. Weyand acknowledged he did not search Durbin before the transaction even though this is his usual protocol.

{¶31} Weyand participated in the search of the camper after the controlled buy. He verified at least two pill bottles with Ben C. or Ben Cutlip printed on them were found inside. One was in a drawer. Weyand's body camera footage was played in part at trial. Appellant can be heard in the recording stating he does not "stay there" at the camper. Appellant can also be heard denying ownership of the safes found in the camper and stating he does not know where the keys are to the safes. During the search, police also found drug paraphernalia, including digital scales used to weigh drugs and pipes and syringes used to administer illegal drugs. (State's exhibit 17.) Weyand stated the shorts Appellant is wearing in the video of the search appear to be the same ones depicted in the confidential informant's video. (Trial Tr. 759.)

{¶32} After closing arguments, there is a jury question about the weight of the drugs in the backpack and in each of the safes found in the camper. The trial court judge, along with the prosecutor and defense counsel, had a lengthy discussion about what the evidence showed as to the weight of methamphetamine found in each of these three containers before the court answered the jury's question. Defense counsel asserted there was conflicting testimony as to how much methamphetamine was found in the black safe. The state agreed indicating the evidence did not establish with certainty how much was in the backpack and the black safe, but said:

> what we know for certain is that the black safe had 167.25 grams. Plus, we know that there were three additional baggies; Officer Duplaga testified that those were half-ounce baggies. We know the gray safe contained 83.7 grams and no additional baggies. And the backpack contained 55.98 grams, plus two, half-ounce additional baggies. * * * But the problem is giving an exact weight would be difficult for the black safe and the backpack.

(Trial Tr. 878-882.) Defense also repeatedly objected to the court's decision to answer the jury question and insisted the court should advise the jury they had to rely on their

collective memories. (Trial Tr. 875-886.) The court answered the question consistent with the state's argument.

**{¶33}** The jury ultimately found Appellant guilty of all three charges. Appellant's sentencing was held June 14, 2021. The court merged counts one and two, and the state elected to proceed on count one. Appellant was then sentenced to a mandatory term of 11 years on count one and 36 months on count three to run consecutively for a minimum mandatory term of 14 years. The court also imposed an indefinite term, resulting in a total prison term of 14 to 19.5 years with five years post-release control; imposed a $20,000 fine; and ordered forfeiture of $3,700 found in the camper.

**{¶34}** Appellant raises six assignments of error on appeal.

### First Assignment of Error: Probable Cause to Issue Search Warrant

**{¶35}** Appellant's first assignment of error asserts:

"The trial court erred by overruling Appellant's motion to suppress."

**{¶36}** Appellant contends the trial court lacked probable cause to issue the warrant that led to the search of the camper for two reasons.

**{¶37}** First, Appellant argues the statements in the affidavit do not amount to probable cause absent some additional indicia of veracity or corroborating evidence as to the informant's reliability. And because none was present here, the trial court's issuance of the warrant was improper and the resulting search and seizure of evidence was illegal and should have resulted in an order suppressing it.

**{¶38}** Second, Appellant claims there was insufficient evidence in the affidavit to establish a connection between the drugs involved in the controlled transaction and the place to be searched, i.e., the camper. He says the affidavit fails to indicate the sale took place in the camper, and as such, the search warrant was improper for this reason as well. For the following reasons, both aspects of Appellant's first assigned error lack merit.

**{¶39}** The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Section 14, Article I of the Ohio Constitution * * * afford[s] the same protection as the Fourth Amendment in

felony cases." *State v. Smith,* 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, ¶ 10, fn. 1.

**{¶40}** An affidavit used to secure a search warrant must provide the issuing magistrate or judge with a substantial basis for determining the existence of probable cause, and wholly conclusory statements in support are not enough. *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317 (1983) (adopting a flexible, common-sense standard when reviewing the sufficiency of affidavits to secure a warrant). When a search warrant is based only on information provided by affidavit, review of the issuing judge's probable cause determination is limited to the information found in the four corners of the affidavit. *State v. Long*, 2020-Ohio-4090, 157 N.E.3d 362, ¶ 22, *appeal not allowed,* 160 Ohio St.3d 1496, 2020-Ohio-5634, 159 N.E.2d 282, and *cert. denied,* 141 S.Ct. 2611.

**{¶41}** Crim.R. 41(C), *Search and seizure*, states in part:

(1) A warrant shall issue on either an affidavit or affidavits sworn to before a judge of a court of record * * *. In the case of a search warrant, the affidavit shall name or describe the person to be searched or particularly describe the place to be searched, name or describe the property to be searched for and seized, state substantially the offense in relation thereto, and state the factual basis for the affiant's belief that such property is there located.

**{¶42}** The Ohio Supreme Court has succinctly set forth the governing law, as well as our standard of review, in *State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989), paragraphs one and two of the syllabus, holding:

In determining the sufficiency of probable cause in an affidavit submitted in support of a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates* [1983], 462 U.S. 213, 238-239, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 followed.)

* * * [T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In

conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant. (*Illinois v. Gates* [1983], 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 followed.)

**{¶43}** The affidavit of Officer Duplaga of the St. Clairsville Police Department states in pertinent part:

I am currently investigating a drug trafficking case that started in the City of St. Clairsville with a traffic stop. During the traffic stop, Officer Duplaga found syringes in the CI's vehicle. The CI offered to do a drug buy on Benjamin C. Cutlip. The CI was in communication with Mr. Cutlip during the date of 7/08/2020. Mr. Cutlip called the CI and told him to come to a camper where he has been staying at the address of * * *[,] an address known by the Belmont County Interdiction Unit. The camper is described as follows: * * *.

On 07/08/2020 at about 2130 the CI arrived at the above camper location to buy meth. The CI did end up buying meth in the amount of about 4 grams for $200.00[.] The CI then met up with Patrolman Weyand to hand the meth over.

This search warrant will be for meth, other dangerous drugs, cell phones, drug abuse equipment, tools for trafficking meth, or any other illegal items that may aid 2925.03 or any other section of 2925.

(July 8, 2020 Affidavit.)

**{¶44}** Duplaga's affidavit led to the issuance of a search warrant that ultimately resulted in Appellant's arrest and these convictions. As stated, the trial court overruled Appellant's motion to suppress and held in part the judge issuing the search warrant had a substantial basis for concluding probable cause existed to justify the issuance of the search warrant. The trial court also found the search warrant issued here was not overly broad and it was issued soon after a controlled drug buy at that same location and the scope of the warrant reasonably included the camper and all containers therein that could

have contained the items to be searched for, i.e., cash, illegal drugs, drug paraphernalia, and cellular phones. (January 27, 2021 Judgment Entry.)

**{¶45}** As for Appellant's first sub-argument, he contends because Duplaga's affidavit contained hearsay statements, the affidavit also had to separately detail and provide evidence bolstering the reliability of the informant. First, we note there is no "indicia of veracity" requirement in Crim.R. 41(C) or the Fourth Amendment.

**{¶46}** Notwithstanding, Appellant's argument likely arises from the U.S. Supreme Court's decision in *Illinois v. Gates*, *supra*, which the Ohio Supreme Court followed in *George, supra*. In *Gates*, the U.S. Supreme Court held reviewing courts addressing attacks on affidavits used to secure search warrants should be reviewed under the totality of the circumstances. *Gates* further said reviewing courts:

> must recognize * * * the value of corroboration of details of an informant's tip by independent police work. In *Jones v. United States,* [362 U.S. 257, 269, 80 S.Ct. 725 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547 (1980)], we held that an affidavit relying on hearsay "is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented." We went on to say that even in making a warrantless arrest an officer "may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge."

*Id.* at 241-42.

**{¶47}** Here, Duplaga's affidavit, which appears to contain certain hearsay information relayed by the informant, has sufficient and reasonable corroboration. Duplaga explains he conducted a traffic stop and found syringes in the informant's car. This stop resulted in the driver agreeing to act as a confidential informant presumably because he was using the items found in his car in connection with his illegal drug use.

**{¶48}** Duplaga also indicates in his affidavit the informant communicated with Appellant, and he told the informant to come to the camper. It is unclear whether this information or exchange was personally heard by Duplaga or if it was told to Duplaga by the informant. Nevertheless, the affidavit also indicates after the informant completed the

controlled drug buy at the camper, the informant returned with about four grams of methamphetamine he purchased for $200. The informant then gave the drugs he purchased to another officer. Although certain inferences are required, the foregoing details are significant indicia of corroboration by independent police work.

**{¶49}** To complete a controlled drug buy, it was likely known by Duplaga and the issuing judge certain procedures need to be followed, usually some type of audio or visual recording and the use of marked or traced money to purchase drugs. And although these protocols are not detailed in Duplaga's affidavit, the fact that he states a controlled drug buy occurred here suggests the police were involved in and oversaw the transaction. Moreover, the informant returned with illegal drugs he handed over to police, which is also significant evidence of corroboration of the informant's story.

**{¶50}** Further, Duplaga indicates in his affidavit the county interdiction unit was already aware of the address at which the defendant was staying before the informant was told by Appellant to go to this address. When referring to the purchase location and the address to be searched, Duplaga refers to it as "an address known by the Belmont County Interdiction Unit." This statement suggests there was other suspected criminal activity at this location, which is corroboration supporting the reliability of the informant's statements and the issuance of the search warrant.

**{¶51}** In light of the foregoing, the trial court did not err in finding the judge issuing the search warrant had a substantial basis for concluding probable cause existed based on Patrolman Duplaga's affidavit. Thus, the first aspect of this assignment lacks merit.

**{¶52}** As for Appellant's second argument, claiming there was insufficient evidence in the affidavit to establish a connection between the drugs involved in the controlled drug buy and the place to be searched, i.e., the camper, this argument lacks merit as well.

**{¶53}** Appellant argues the affidavit fails to indicate the sale took place in the camper. However, the affidavit states Appellant was "staying" at the camper at the time; he told the informant to go to this location; and the controlled drug buy occurred at that same camper, which resulted in the informant returning with methamphetamine. Whether the transaction occurred inside or outside of the camper is irrelevant. There is more than a sufficient connection to this location based on the averments in the affidavit.

**{¶54}** Upon affording great deference to the judge issuing the search warrant, we find the affidavit used to secure the search warrant in this case was issued by a judge who had a substantial basis for concluding probable cause existed. *George, supra*, at 641.

**{¶55}** Last, Appellant argues the good-faith exception will not apply in this case if we find a lack of probable cause. That rule provides:

> The Fourth Amendment exclusionary rule should not be applied so as to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. (*United States v. Leon* [1984], 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677, followed.)

*State v. George*, 45 Ohio St.3d 325, 544 N.E.2d 640 (1989).

**{¶56}** Because the affidavit in support of the warrant here was more than sufficient to show the judge had probable cause to issue the warrant, this court will not analyze the application of the good-faith exception since the issue is moot. *See Pernick v. Dallas*, 7th Dist. Jefferson No. 21 JE 0011, 2021-Ohio-4635, ¶ 51, *appeal not allowed,* 166 Ohio St.3d 1449, 2022-Ohio-994, 184 N.E.3d 159 (declining to address moot issue). Thus, Appellant's first assignment lacks merit in its entirety.

### Second Assignment of Error: Potential Juror's Damaging Statement

**{¶57}** Appellant's second assignment of error asserts:

"The trial court erred by overruling Appellant's motion for a mistrial when a potential juror stated during voir dire that he had arrested Appellant several times."

**{¶58}** Appellant asserts he was denied his Sixth Amendment Right to an impartial jury based on the potential juror's derogatory statement about him at the beginning of the proceedings. He claims the trial court abused its discretion by not declaring a mistrial.

**{¶59}** A mistrial is appropriate when the substantial rights of the accused or prosecution are adversely affected making a fair trial no longer possible. *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066 (1973); *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). The decision to grant a mistrial "is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required

to meet the ends of justice." *State v. Jones*, 83 Ohio App.3d 723, 615 N.E.2d 713 (2d Dist.1992).

**{¶60}** Because the trial court is afforded broad discretion upon considering a motion for a mistrial, we review that decision for an abuse of discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus.

**{¶61}** During the initial questioning of the jury pool at the beginning of voir dire, the judge asked if any of the potential jurors were acquainted with the parties. One juror raised his hand indicating he knew the defendant. A while later, while speaking directly to this potential juror in the presence of the other potential jurors, the following exchange took place:

> THE COURT: All right. Mr. Burns, * * * I believe the first [issue] was you had an acquaintance with the case and/or the parties?
>
> PROSPECTIVE JUROR BURNS: Yes.
>
> THE COURT: And how's that? I don't want you to go into details about what you know, just how you know.
>
> PROSPECTIVE JUROR BURNS: As [a] former police officer, I've arrested the defendant on several occasions.

**{¶62}** Counsel and the judge immediately conducted a sidebar conference out of the presence of the jury, and Appellant's attorney asked for a mistrial or in the alternative, for a curative instruction directing the jury to disregard Mr. Burns' statement. The state agreed a curative instruction was appropriate, and the court directly thereafter addressed the jury pool and stated:

> Mr. Burns has just indicated a prior relationship or interaction with Mr. Cutlip. You are to disregard that comment. Remember, I told you earlier, you decide guilt or innocence based on the evidence that you hear from the witness stand, that you see from the witness—as presented by the witnesses. So you are to disregard the comment by Mr. Burns or the answer to the question that he gave. That is to have no impact whatsoever upon anything else that occurs during the trial of this case.

The court then excused Mr. Burns as a potential juror and immediately proceeded to address a different prospective juror. (Trial Tr. 12, 27-30.)

Case No. 21 BE 0032

{¶63} As stated, Appellant claims it was an abuse of discretion not to grant a mistrial based on Mr. Burns' statement. Alternatively, he contends the court should have individually polled the jurors to ensure their impartiality was not tainted by his statement.

{¶64} The Ohio Supreme Court in *State* v. *Garner*, 74 Ohio St.3d 49, 59, 656 N.E. 2d 623 (1995) addressed a comparable issue. In *Garner*, a police investigator inadvertently testified during trial the defendant had been previously arrested. The officer said in part upon researching the phone number associated with a certain address, "it came back [to] William Garner *using that address in one of his arrests.*" (Emphasis added.) The officer essentially told the jurors Garner had been arrested at least twice. Garner's attorney objected to this reference and moved for a mistrial. The court overruled the motion but sustained the objection to this line of testimony. It immediately instructed the jury to disregard the officer's statement. *Id.* at 58. On appeal, the Supreme Court upheld the decision denying the motion for mistrial. It held there was no abuse of discretion because the reference to the defendant's prior arrests was fleeting and promptly followed by curative instructions. *Id.*

{¶65} This court reached the same outcome in another case. In *State v. Loterbaugh*, 7th Dist. Carroll No. 19 CA 0931, 2020-Ohio-1104, we found the defendant was not denied a fair trial based on his mother's inadvertent statement during her testimony that the defendant (her son) had previously been in jail. We noted the reference was brief, isolated, and did not unfairly prejudice the defendant. *Id.* at ¶ 57-58.

{¶66} Consistent with *Garner* and *Loterbaugh*, the potential juror's statement about arresting Appellant in this case was limited in duration and detail. It provided no information about Appellant's prior arrests or what the alleged offenses were, and the trial court's curative instruction was given immediately and before the court began addressing another potential juror. The trial court also swiftly overruled Appellant's motion for a mistrial, and discharged Mr. Burns as a potential juror.

{¶67} When the jury was selected and after they entered the courtroom together for the first time, the court reminded the jurors they had not yet heard any evidence in the case and all of the preliminary jury selection comments and questions were not evidence in this case. (Trial Tr. 165.) The jurors verified they would abide by the court's

instructions, apply the law, and limit their determination to only the evidence presented at trial.

**{¶68}** And the Supreme Court has held, "[i]f an error occurs, such as the jury hearing improper testimony, the 'jury is presumed to follow the instructions, including curative instructions, given it by a trial judge.'" *State v. Cepec*, 149 Ohio St.3d 438, 2016-Ohio-8076, 75 N.E.3d 1185, ¶ 89*,* quoting *Garner*, *supra*, 59. Thus, we presume the jurors disregarded Mr. Burns' statement during voir dire.

**{¶69}** Moreover, Officer Duplaga testified during trial that he asked Durbin if he could act as an informant on Appellant. Durbin said he would try and he had met Appellant while the two were in jail together. (Trial Tr. 307-308.) Thus, evidence Appellant had previously been arrested was before the jury thereby reducing any affect Mr. Burns' statement may have had.

**{¶70}** Appellant contends the court should have polled the jurors to ensure each was able to perform their role as impartial jurors and disregard the comment during the proceedings. While this may have helped ensure the jurors understood their obligation, the questioning proposed by Appellant may have highlighted the substance of Mr. Burns' statement, and the repetition of it may have amplified the alleged damage.

**{¶71}** Based on the foregoing, the trial court did not abuse its discretion by overruling Appellant's motion for a mistrial, and Appellant had a fair trial notwithstanding the potential juror's comment. This assignment of error lacks merit.

### Third Assignment of Error:  Manifest Weight of the Evidence

**{¶72}** Appellant's third assignment of error asserts:

"Appellant's convictions were against the manifest weight of the evidence."

**{¶73}** Appellant identifies four reasons or sub-arguments which allegedly show the jury lost its way and failed to properly evaluate the evidence presented at trial, and thus, he claims this court should reverse and remand for a new trial. Appellant claims the testimony of the confidential informant was so dubious the jury could not have believed him; the state's evidence failed to show a substantial connection between Appellant and the camper where the drugs were found; the state failed to establish with enough detail where the varying quantities of drugs were found; and collectively these shortcomings establish his convictions are against the manifest weight of the evidence.

**{¶74}** A manifest weight review requires us to review the evidence and determine whether this is an exceptional case in which it is patently apparent the jury lost its way. *State v. Thompkins*, 78 Ohio St.3d 380, 389, 678 N.E.2d 541 (1997). The reversal of a jury's verdict on manifest weight grounds requires a unanimous concurrence of all three judges. *Id.*

> The * * * weight of the evidence addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive—the state's or the defendant's? * * * [A]lthough there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. * * * 'When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.' * * *.

*State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25.

**{¶75}** "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass,* 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. "A jury is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis,* 8th Dist. Cuyahoga No. 98538, 2013-Ohio-1184, ¶ 18, citing *Iler v. Wright,* 8th Dist. Cuyahoga No. 80555, 2002-Ohio-4279, ¶ 25.

**{¶76}** As stated, Appellant was convicted of count one, aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(1)(f), a first-degree felony with a major drug offender specification and forfeiture of money specification, which state:

> (A) No person shall knowingly do any of the following:
>
> * * *
>
> (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.
>
> * * *

Case No. 21 BE 0032

(C) Whoever violates division (A) of this section is guilty of one of the following:

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, * * * whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

* * *

(f) If the amount of the drug involved equals or exceeds one hundred times the bulk amount * * *, aggravated trafficking in drugs is a felony of the first degree, the offender is a major drug offender, and the court shall impose as a mandatory prison term a maximum first degree felony mandatory prison term.

R.C. 2925.03.

**{¶77}** Appellant was also convicted of count three, aggravated trafficking in drugs in violation of R.C. 2925.03(A)(1) and (C)(1)(c), a third-degree felony with a forfeiture of money specification, which state:

(A) No person shall knowingly do any of the following:

(1) Sell or offer to sell a controlled substance or a controlled substance analog;

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, * * * whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

* * *

(c) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount, aggravated trafficking in drugs is a felony of the third degree,

and, except as otherwise provided in this division, there is a presumption for a prison term for the offense.

R.C. 2925.03.

**{¶78}** As for count one, the state detailed via the testimony of Durbin, Duplaga, Taggart, and Weyand that more than 400 grams of methamphetamine was found in the bedroom of the camper where Appellant was staying. Appellant told Durbin to come to this location where they both used methamphetamine and where Appellant sold Durbin methamphetamine.

**{¶79}** During the recording of their interaction, which was played at trial, Durbin met with Weyand at the beginning of the recording and is given a key fob recording device before driving to meet Appellant. Several segments of the recording were introduced at trial.

**{¶80}** Appellant can initially be heard asking Durbin how he learned about him or who told him about him, and then he told Durbin it does not matter if everything is "cool." While outside, they talked about a motorcycle Appellant wanted to sell before they went inside. Appellant stated in passing his wife wanted to take the motorcycle from him since he crashed it.

**{¶81}** The two then went inside where they begin talking about drugs. Appellant can be heard stating he is meticulous in weighing and appears to brag about what he sells as high quality and not "junk" drugs otherwise cut or mixed with another substance. Durbin purchased 3.46 grams of methamphetamine, or one "ball," for $200 from Appellant. Appellant can be heard in the recording also offering to sell him a larger quantity at a discounted rate; he would sell Durbin "four balls for seven," meaning $700. (Trial Tr. 363-364.)

**{¶82}** Appellant then can be heard talking about other people who have reduced the weight of "zips" and "balls" in order to increase profits, before he says he "will do one with you," meaning using drugs with Durbin. Appellant can be heard asking Durbin if he needs a "stick," meaning a needle for injecting. Durbin says he was having trouble, indicating he was unable to find a vein to use. Appellant then asked Durbin: "Did you get a good one. If not, I'm gonna get you some more?" Durbin told Appellant he "can't get good shit" lately.

**{¶83}** Appellant then instructs Durbin not to tell anyone where he "got this stuff" unless they already know him. "I don't let everybody through that door." He said people who tamper with his "stuff," damage his reputation with "junk dope." (State's exhibit 29.)

**{¶84}** After the search warrant was issued, the police searched the camper and found more than 400 grams of methamphetamine. The officers had to cut open a locked backpack, which contained several smaller bags or containers that had individual or smaller sized plastic bags of a substance in each. Some were packaged for sale in stamp-sized baggies. Two safes were found and Appellant denied having the keys or knowing the combinations. One contained baggies later determined to contain methamphetamine, and each was similar to that sold to Durbin. (State's exhibits 12-A, 17 & 25.)

**{¶85}** The weight of each evidence bag is detailed in testimony and in the BCI reports. The seized drugs, money, and drug paraphernalia are depicted in the state's photograph exhibit 17. It shows numerous baggies of varying quantities and sizes, along with cash and drug paraphernalia, secured via the warrant. (State's exhibit 17.) The money the police gave to Durbin and he used to purchase methamphetamine from Appellant was found in a locked bag under a pillow on the bed in the camper. The money was found in a bag with other cash totaling $3,700.

**{¶86}** Weyand acknowledged he did not search Durbin before the transaction even though this is the usual protocol. The defense relies on this detail as showing Durbin may have planted the drugs to help the police with Appellant and secure reduced criminal charges for himself. The defense also relies on Appellant's statements heard in the search warrant body camera footage when Appellant asserts this is not his camper and he does not stay there. However, the jury did not believe him.

**{¶87}** As mentioned, Appellant first claims Durbin lacked credibility and this coupled with the fact police failed to search him before the controlled drug buy gave Durbin motive and opportunity to "set up" Appellant in order to secure leniency in Durbin's own criminal cases.

**{¶88}** While the evidence does establish the officers did not search Durbin, which is out of compliance with protocol, this fact was before the jury for it to consider. Also, Durbin was very candid and forthcoming in his testimony in which he details his history of

abusing drugs and criminal record, which he incurred mostly to support his addiction. This information was before the jury for it to consider, and it believed Durbin nonetheless. Thus, this fails to show Appellant's convictions are against the manifest weight of the evidence. Credibility issues are within the realm of the trier of fact, and it is not the function of a reviewing court to second-guess a jury's decision. *State v. Johnson*, 7th Dist. Mahoning No. 19 MA 0030, 2020-Ohio-3640, ¶ 7 (the jury is in the best position to view the witnesses, observe their demeanor, gestures, and voice inflections).

**{¶89}** As for the next sub-argument, Appellant argues there was conflicting evidence as to whether he had control over the camper where the drugs were found. His counsel intimated throughout trial the drugs were not Appellant's but they belonged to and were being sold by the two women, who were also present during the controlled buy and subsequent search. We disagree.

**{¶90}** Although Brado and Brown were both present at the time of the search and the Durbin transaction, the recording of the controlled drug buy clearly depicts Appellant as the individual interacting with Durbin and handling the transaction. Brown can be heard leaving soon after Durbin's arrival, and the audio suggests Brado was in another part of the camper during the majority of Durbin's visit. Her interaction with Durbin was limited and occurred only at Appellant's prompting.

**{¶91}** Further, there was more than enough evidence showing Appellant was either the owner of the camper or was staying there with Brado, who Appellant referred to as his wife in the recording. The owner of the RV site verified Appellant paid two months' rent for the site and he believed Appellant owned the camper. Officer Weyand also found two pill bottles inside the camper with Appellant's name on them. Durbin's testimony and controlled drug buy footage establish the two men were at the camper, both inside and out, for the extent of the transaction.

**{¶92}** Appellant's third sub-argument contends the evidence at trial was unclear about what quantities of methamphetamine were found in the camper and this is illustrated by the jury's question about what quantity was found in which container. Contrary to Appellant's argument, the state provided evidence via testimony and exhibits detailing the quantity of methamphetamine found. The weight of each state's exhibit was verified via Taggart's testimony and his report. (State's exhibit 23.) And at the conclusion

of Taggart's testimony, the trial court had him verify the sum of the first eight state's exhibits and that each contained methamphetamine. State's exhibits one through eight totaled approximately 428.01 grams. This is in addition to the 3.46 grams from state's exhibit 12, for a total of approximately 431.47 grams for all of the containers found to contain methamphetamine. (Trial Tr. 527-530; state's exhibit 23.)

**{¶93}** It was undisputed the drugs were found inside the camper in varying containers, including backpacks, smaller cloth bags with locked zippers, and locked safes. Whether a certain quantity or baggie was found in a backpack or a black safe is of no consequence since it all was found in the camper. This argument fails to show Appellant's convictions are against the manifest weight of the evidence.

**{¶94}** Finally, Appellant contends collectively the three arguments make his convictions against the manifest weight of the evidence. This court disagrees because we cannot conclude it is patently apparent the jury lost its way. Thus, this assigned error is overruled.

### Fourth Assignment of Error: Insufficient Evidence

"Appellant's conviction for trafficking (Count 1) was unsupported by sufficient evidence."

**{¶95}** Appellant asserts there was insufficient evidence to convict for count one, contending the only way to reach the finding was to stack an inference upon an inference. Thus, he claims his conviction in violation of R.C. 2925.03(A)(1) must be reversed.

**{¶96}** Whether evidence is legally sufficient to sustain a verdict is a question of law, which appellate courts review de novo. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997); *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 3. On appeal we determine whether the evidence presented, viewed in a light most favorable to the prosecution, allows a rational trier of fact to find the essential elements of the crime established beyond a reasonable doubt. *State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, *reconsideration denied sub nom. State v. Walker*, 160 Ohio St.3d 1517, 2020-Ohio-6946, 159 N.E.3d 1179.

**{¶97}** The only count Appellant challenges here is count one, aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(1)(f), a first-degree felony

with a major drug offender specification and forfeiture of money specification, which provide:

(A) No person shall knowingly do any of the following:

* * *

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

* * *

(C) Whoever violates division (A) of this section is guilty of one of the following:

(1) If the drug involved in the violation is any compound, mixture, preparation, or substance included in schedule I or schedule II, * * * whoever violates division (A) of this section is guilty of aggravated trafficking in drugs. The penalty for the offense shall be determined as follows:

* * *

(f) If the amount of the drug involved equals or exceeds one hundred times the bulk amount * * *, aggravated trafficking in drugs is a felony of the first degree, the offender is a major drug offender, and the court shall impose as a mandatory prison term a maximum first degree felony mandatory prison term.

R.C. 2925.03.

**{¶98}** Because Appellant limits his challenge in this assignment to the first count, we likewise limit our review. Appellant contends in order to convict him of count one, the jury had to stack inferences, claiming it had to infer Appellant had access to the drugs inside the camper and infer he packaged them for sale. He claims the jury could not have reached this conclusion any other way. We disagree.

**{¶99}** In support, Appellant relies on *State v. Cowans*, 87 Ohio St.3d 68, 78, 717 N.E.2d 298 (1999), which held in part:

Case No. 21 BE 0032

A trier of fact may not draw "[a]n inference based * * * entirely upon another inference, unsupported by any additional fact or another inference from other facts[.]" *Hurt v. Charles J. Rogers Transp. Co.* (1955), 164 Ohio St. 329, 58 O.O. 122, 130 N.E.2d 820, paragraph one of the syllabus. However, "[a]n inference * * * based in part upon another inference and in part upon facts is a parallel inference and, if reasonable, may be indulged in * * *." *Id.,* paragraph two of the syllabus.

The Supreme Court in *Cowans* agreed because the state relied on the victim's lack of defensive wounds to argue and allow the jury to infer her attacker used a weapon to subdue her. Then the state used a second inference, i.e., "that the BB gun found in Cowans' truck was the weapon used." *Id.* at 79.

{¶100} Here, there is no such inference stacking necessary. To the contrary, there was direct evidence Appellant had access to the camper and sold Durbin methamphetamine from that location. Appellant told Durbin to meet him at the camper. Appellant met Durbin there and escorted him inside. Further, the owner of the RV site testified Appellant paid the fee for renting the site and believed Appellant owned the camper. Moreover, pill bottles with Appellant's name on them were found in the bedroom area of the camper that also contained a large quantity of drugs. Some of the methamphetamine found inside the camper was packaged for sale in individualized baggies.

{¶101} During the video Appellant can be heard offering to sell Durbin a larger quantity at a discount, and Appellant suggests Durbin could then sell the drugs to his co-workers. Digital scales and other drug paraphernalia were also found in the camper, and during Durbin's visit, Appellant weighed the drug in front of Durbin to show him how much he was buying. (Trial Tr. 606-607.)

{¶102} There was more than enough direct and circumstantial evidence presented at trial showing Appellant either owned the camper or lived there and he sold drugs from that location. Thus, the only inference the jury arguably had to make was Appellant packaged or prepared the methamphetamine in the individual baggies found in the camper for sale. This conclusion was reasonable in light of Appellant's recorded statements touting the quality and quantity of the drugs he sold. Further, Taggart testified

Case No. 21 BE 0032

as to the quantity or weight of each container and verified the state's exhibits one through eight and twelve each were found to contain methamphetamine. Collectively, state's exhibits one through eight were found to contain more than 400 grams of methamphetamine, a Schedule II drug. (Trial Tr. 542-543 & 547.)

{¶103} Thus, Appellant's argument claiming improper stacking of inferences has no merit. When viewed in a light most favorable to the prosecution, the evidence at trial allowed the jury to find the essential elements of the crime established beyond a reasonable doubt, and as such, this assignment is overruled.

### Fifth Assignment of Error: Judge Invading the Province of the Jury

{¶104} Appellant's fifth assignment of error asserts:

"The trial court abused its discretion in responding to a jury question."

{¶105} Appellant argues the trial court abused its discretion by answering a jury question. After closing arguments and during deliberations, the jury asked about the weight of the drugs in three containers found during the search: the black safe, the gray safe, and the backpack. Appellant claims the trial court's act of answering this question decided a question of fact, in place of the jury, and the court's answer to the question was unsupported by evidence.

{¶106} For the following reasons, we find the trial court erred by answering the jury's question in the manner it did, instead of advising the jury to rely on their collective memories of the evidence and to review the exhibits or by reading a segment of trial testimony to the jury. Nevertheless, its error was harmless because Appellant fails to identify resulting prejudice.

{¶107} The precise text of the jury's question is not in the record, but the following exchange summarizes the jury's question, counsels' responses and objections, and the court's response:

THE COURT: All right. [The bailiff] just handed me this, said he got a call from one of the jurors. He went in and they handed him that.

So [the court reporter] thinks it means how much weight was in each safe and how much weight was in the backpack.

So, Mr. Flanagan, what do you want me to respond?

THE PROSECUTOR: Well, I could see it going two ways. First of all, you must rely on your collective memory, or it was pretty definitive if we spell out the amounts that were in the backpack. I would have no issue if we did that.

THE COURT: That is my thinking, too.

[DEFENSE COUNSEL]: * * * we would request that the Court answer that they have to rely on their collective memories of the evidence; that we are not permitted to comment on evidence. Thank you.

(Trial Tr. 875.)

{¶108} The court then directs counsel to consult their notes on the issue, so they could determine how much was in each safe and the backpack. Defense counsel renews his objection to answering the question but participates in the discussion.

{¶109} In response to the court's directive, defense counsel proposed telling the jury the evidence presented during trial showed the gray safe contained 83.7 grams of alleged methamphetamine and the backpack was found to contain 55.98 grams of alleged methamphetamine. He then advised the court the testimony about the amount of alleged methamphetamine in the black safe was conflicting. He stated one witness testified the black safe contained 209.25 grams whereas another witness said it contained 167.25 grams. Thus, he recommended telling the jury the lower number, or the black safe contained 167.25 grams of alleged methamphetamine. (Trial Tr. 877-878.)

{¶110} In response, the prosecutor agreed providing the exact amount or weight of the alleged drugs found in the black safe would be difficult. Notwithstanding, the prosecutor then explained away the discrepancy in the testimony, indicating the contents weighed 167.25, and in addition, there were three additional baggies containing half an ounce each or 14 grams each bag. So, the prosecutor indicated the black safe contained 209.25 grams total—167.25 grams plus 42 grams (the product of 14 times three). (Trial Tr. 879-880.)

{¶111} As for the backpack, the prosecutor explained the discrepancy on the weight of its contents as well, stating the testimony showed the backpack contained 55.98 grams in addition to two additional half-ounce bags, containing approximately 14 grams in each for an additional 28 grams. Thus, the state proposed telling the jury the backpack contained 83.98 grams of alleged methamphetamine, since 28 plus 55.98 equals 83.98.

Case No. 21 BE 0032

During this discussion with the court, defense counsel did not dispute the existence of these additional baggies in evidence or the stated quantities indicated by the prosecutor, but he consistently objected to the court answering the jury's question.

{¶112} The trial court then concluded this colloquy with counsel and informed them it was going to answer the jury question by stating: "Smaller safe, gray, 83.70 grams. Larger safe, black, 209.25 grams. Backpack 83.98 grams. You must use your collective memories to consider these and the remaining amounts as listed on State's Exhibit * * * 23." (Trial Tr. 885-886.) Thus, the court used the larger quantity totals proposed by the state. The state's exhibit 23 is Taggart's BCI laboratory report detailing the weight and content of each of the state's 12 evidence bags.

{¶113} The jury's question, seeking the weight of the substance found in the two safes and the backpack, seems to spring from defense counsel's cross-examination of Officer Duplaga toward the end of the trial. He asked Duplaga about the weight of the methamphetamine found in these three containers. Duplaga first verifies according to his calculations, the total amount of methamphetamine recovered was 428.01 grams. (Trial Tr. 737-738.) Duplaga is then asked to confirm via cross-examination the black safe found under the bed contained 167.25 grams; the small gray safe was found to contain 83.70 grams; and the backpack was found to contain 55.98 grams. (Trial Tr. 739-742.) Although Duplaga readily agreed with the defense's stated quantities, no one brought up the additional quantities found in the half-ounce baggies found in the black safe and the backpack during this segment of his testimony.

{¶114} The jury likely had this question because this line of cross-examination does not correlate with the manner in which the state presented its testimony or the way the state packaged its evidence found during the search of the camper. State's exhibit 23 (Taggart's report) listed, weighed, and analyzed the 12 state's evidence bags; it does not, however, indicate whether each baggie was found in the black safe, the gray safe, the backpack, or elsewhere. The testimony during the state's case in chief likewise does not align with or correspond to these three containers.

{¶115} The Supreme Court has addressed the propriety of a trial court's decision to answer a jury question during deliberations and held a court is well within its discretion to read back part or all of a particular witnesses' testimony in order to answer a jury's

question. *State v. Berry*, 25 Ohio St.2d 255, 267 N.E.2d 775 (1971) paragraph four of the syllabus; *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 123.

**{¶116}** And other courts, including this one, have held a court has discretion *not* to answer a jury question during deliberations. *State v. Hull*, 7th Dist. Mahoning No. 04 MA 2, 2005-Ohio-1659, ¶ 48-49, *aff'd,* 110 Ohio St.3d 183, 2006-Ohio-4252, 852 N.E.2d 706; *State v. Brown*, 11th Dist. Trumbull No. 95-T-5349, 2000 WL 522339, *4. It is widely acceptable to advise the jury to rely on its recollection of the evidence presented at the trial. *Id.*

**{¶117}** In *State v. Frost*, 14 Ohio App.3d 320, 471 N.E.2d 171 (11th Dist.1984), the Eleventh District Court of Appeals found the trial court abused its discretion when it responded to several jury questions during deliberations by questioning a witness. *Frost* reversed and remanded, finding the trial court erred by "interrogating the arresting officer, an Ohio State Patrol trooper, as to said evidence in the presence of the jury." *Id.* at 322. The court of appeals held: "Any question by the jury during its deliberations, as to matters of evidence, if answered by the court, may only be answered by repeating, in some fashion, the evidence or testimony offered during the trial itself." *Id.* at 322.

**{¶118}** Unlike *Berry* and *Leonard*, the trial court here not only repeated evidence, but arguably construed it to conform to the substance of the juror's question. The court did not merely re-read Duplaga's or Taggart's testimony but added certain figures to secure an answer that does not appear to neatly correspond with one exhibit or one witness' testimony. Thus, the court acted in an arbitrary and capricious manner by answering the question in the manner it did, and consequently, we find an abuse of discretion. Notwithstanding, the error was harmless. *See State v. Jones*, 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872, ¶ 18-19.

> [W]hen a defendant objects to an error, an appellate court applies harmless-error review. * * * Under that standard, the state "bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." * * * Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it

affected the outcome of the trial.   * * * An appellate court is required to reverse the conviction when the state is unable to meet its burden.  * * *

We have recognized that when a defendant is represented by counsel and tried by an impartial fact-finder, there is a strong presumption that all errors—constitutional and nonconstitutional—are subject to harmless-error review.

*Id.*

{¶119}  As stated, Appellant was convicted of count three:  aggravated trafficking in drugs, methamphetamine, a third-degree felony in violation of R.C. 2925.03(A)(1) and 2925.03(C)(1)(c) with a forfeiture of money specification.  Count three corresponds with the sale to Durbin, who purchased 3.46 grams of methamphetamine from Appellant. State's exhibit 12 contained the substance Durbin delivered to police after the transaction and was analyzed by Taggart.  (Tr. 435-426, 719; state's exhibit 23.)

{¶120}  Appellant was also convicted of count one:  aggravated trafficking in drugs, methamphetamine a Schedule II drug in an amount that meets or exceeds 100 times the bulk amount, a first-degree felony in violation of R.C. 2925.03(A)(2) and 2925.03(C)(1)(f) with a major drug offender specification and a forfeiture of money specification.  As explained and detailed via trial testimony, when dealing with methamphetamine, an amount more than three grams constitutes bulk amount, and 100 times bulk amount is 300 grams or more.  (Trial Tr.  543-544.)

{¶121}  It is undisputed in addition to the 3.46 grams sold to Durbin, more than 400 additional grams of methamphetamine were found in the camper.  This includes the drugs found in both safes and the backpack as well as other amounts found elsewhere, not in these three containers.  Duplaga testified that 428.01 grams of methamphetamine were found in the camper during the search, which corresponds with count one, and this was in addition to the 3.46 grams sold to Durbin, which supported count three.  (Trial Tr. 423-426; state's exhibit 23.)   Thus, the trial court's error was harmless since the court's decision to calculate certain quantities when answering the jury question did not affect the outcome of the proceedings.

{¶122} Further, the quantities proposed by Appellant's counsel during the colloquy with the court also equal more than 300 grams.  Consequently, had the trial court

used Appellant's proposed quantities, which totaled 306.93, this was sufficient to support a conviction on count one. Despite the error, reversal is not required.

### Sixth Assignment of Error: Ineffective Trial Counsel

{¶123} Appellant's sixth and final assignment of error asserts:

"Appellant's counsel was ineffective."

{¶124} To establish a claim of ineffective assistance of counsel, a defendant must show both his trial counsel's performance was deficient, in that it fell below an objective standard of care, and the deficient performance resulted in prejudice. *State v. Bradley*, 42 Ohio St.3d 136, 141-143, 538 N.E.2d 373 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984).

{¶125} Licensed attorneys in Ohio are presumed competent. *State v. Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). In evaluating trial counsel's performance, appellate review is highly deferential because of the strong presumption counsel's conduct fell within the wide range of reasonable professional assistance. *Bradley* at 142-143, citing *Strickland* at 689. In fact, appellate courts are prohibited from second-guessing trial counsel's strategic decisions. *State v. Carter*, 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶126} Appellant claims his trial counsel was deficient for not filing an affidavit of indigency in light of the fact Appellant had been deemed indigent at the beginning of the proceedings and for not asking the court to waive the mandatory fine. Because the court imposed a $20,000 fine, Appellant claims he was prejudiced as a result of his attorney's deficiency. This court disagrees and overrules this assigned error because Appellant cannot establish his counsel was deficient and likewise cannot show resulting prejudice based on the record.

{¶127} R.C. 2929.18(B)(1), governing felony financial sanctions, states in part:

> For a first, second, or third degree felony violation of any provision of Chapter 2925. * * * of the Revised Code, the sentencing court shall impose upon the offender a mandatory fine of at least one-half of, but not more than, the maximum statutory fine amount authorized for the level of the offense pursuant to division (A)(3) of this section. If an offender alleges in an affidavit filed with the court prior to

sentencing that the offender is indigent and unable to pay the mandatory fine <u>and</u> if the court determines the offender is an indigent person <u>and</u> is unable to pay the mandatory fine described in this division, the court <u>shall not</u> impose the mandatory fine upon the offender.

(Emphasis added.)

**{¶128}** Thus, the court is prohibited from imposing the corresponding fine *if* the defendant files an affidavit of indigency before sentencing *and if* the court also determines the defendant is indigent and unable to pay. A plain reading of R.C. 2929.18(B)(1) shows that both prongs must be met. *Id.*

**{¶129}** As Appellant contends, his trial counsel did not file the requisite affidavit in advance of Appellant's sentencing, as required in R.C. 2929.18(B)(1). However, no one raised the lack of affidavit of indigency before the court imposed Appellant's sentence, and the state did not object on this basis.

**{¶130}** Moreover, Appellant's attorney *did* ask the court to waive the mandatory fees during the sentencing hearing. The court addressed the issue on the merits and apparently without notice that a financial affidavit was not filed beforehand. During Appellant's sentencing hearing, his defense counsel orally moved the court to waive the mandatory fines. The following exchange occurred:

[DEFENSE COUNSEL]: * * * my client has been incarcerated for some time and he will be incarcerated for some time hereafter. I do make a motion for the Court to not impose fines in this case in light of his indigent status, Your Honor.

* * *

THE COURT: An interesting point because I remember the testimony from the trial that all of this is alleged to have occurred in a camper/trailer structure on someone else's property according to the owner of that property. Does Mr. Cutlip own that?

[DEFENSE COUNSEL]: My client claims that he does not own that camper, Your Honor.

THE COURT: All right. It was not specified for forfeiture. However, if there was a judgment for costs, it could be executed against if the title is [in] Mr. Cutlip's name, but you're indicating that it is not?

[DEFENSE COUNSEL]: That is my understanding, Your Honor. It is not.

THE COURT: Does the state have a position on the mandatory fine, which can be waived due to indigency?

[THE PROSECUTOR]: We ask at this juncture that it not be waived, Your Honor.

(Sentencing Tr. 6-7.)

{¶131} Thereafter, upon announcing Appellant's sentence, the court states in part: "The Court is going to impose the $20,000 fine, rejecting the finding of indigency. The Court's mindful, of course, it's unlikely that it will ever be paid, but nevertheless, that message has to be made clearly known." (Sentencing Tr. 12-13.)

{¶132} Based on the foregoing, Appellant is unable to establish his trial counsel was deficient for failing to *file* the affidavit in advance of sentencing when the court operated on the assumption it was filed. His counsel orally requested the court waive the fees, and the court declined to do so on the merits, indicating it believed Appellant was the owner of the camper. Thus, Appellant's ineffective assistance argument lacks merit since he does not show his counsel was deficient for this reason.

{¶133} As for the prejudice prong of an ineffective assistance of counsel claim, Appellant's argument fails to satisfy this prong too for the following reasons.

{¶134} Upon addressing a comparable case, the Ohio Supreme Court in *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, reiterated an appellate court's standard of review when addressing the second prong of an ineffective assistance of trial counsel claim, explaining:

[A] court's finding of ineffective assistance of counsel depends on the facts and circumstances in each case. * * *[W]hen an indigent defendant makes an ineffective-assistance-of-counsel claim based upon counsel's failure to request a waiver of court costs, a reviewing court must * * * [when analyzing] the prejudice prong, * * * consider the facts and circumstances of the case objectively to determine whether the defendant established the necessary

Case No. 21 BE 0032

prejudice sufficient to support that claim—i.e., *but for counsel's deficient performance, there exists a reasonable probability that the result of the proceeding would have been different.* * * * " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' "

(Citations omitted.) *State v. Davis*, 159 Ohio St.3d 31, 2020-Ohio-309, 146 N.E.3d 560, ¶ 10.

**{¶135}** Assuming counsel was deficient, we must next determine whether "but for counsel's deficient performance, there exists a reasonable probability that the result of the proceeding would have been different." *Id.* Therefore, this court must assess whether if Appellant's counsel had filed his financial affidavit reflecting zero income and zero assets, would this have affected the court's imposition of the $20,000 fine? Because no one brought the lack of financial affidavit to the court's attention, and it appears the court operated on the assumption one was in fact filed, Appellant fails to establish this prong as well.

**{¶136}** As for the trial testimony relied on by the trial court, David Wise testified he owns the recreational vehicle site on which the camper was located when it was searched. Wise explained Appellant and Brado, and sometimes her daughter, lived in the camper. Based on his conversations with Appellant, Wise believed the camper belonged to him. Although Brado made the arrangements to rent the site from Wise, Appellant paid him the $500. Further, Wise testified he "believed" Appellant owned the camper, explaining: "It was my idea that he owned it because of some of the discussions that we had and the way he talked. He expressed at one point some regrets in buying it because of – it wasn't in quite as good condition as what he hoped it would be and having to do maintenance repairs on it." (Trial Tr. 224-226.) And at the time of trial, they still owed Wise money, and the camper was still on his property. (Trial Tr. 227-228.)

**{¶137}** Furthermore, whether a defendant "was determined to be indigent for the purposes of appointed counsel 'is separate and distinct from a determination of being indigent for purposes of paying a mandatory fine.'" *State v. Millender,* 5th Dist. Fairfield No. 03-CA-78, 2004-Ohio-871, ¶ 8, quoting *State v. Bolden,* 12th Dist. No. CA2003-03-007, 2004-Ohio-184. *See, also, State v. Johnson,* 6th Dist. No. L-03-1046, 2004-Ohio-2458, ¶ 33. There is a "difference between a defendant's inability to raise an

initial retainer in order to obtain trial counsel and the ability to gradually pay an imposed mandatory fine over a period of time." *State v. Banks*, 6th Dist. Lucas No. WD-06-094, 2007-Ohio-5311, ¶ 15, citing *State v. Young,* 5th Dist. Delaware No. 03-CAA-10051, 2004-Ohio-4002, ¶ 16.  Thus, the appointment of trial counsel is not determinative of the defendant's ability to pay a mandatory fine after conviction.  *Id.  Accord State v. Delgadillo-Banuelos*, 10th Dist. Franklin No. 18AP-729, 2019-Ohio-4174, ¶ 28.  "[A]n offender who files an affidavit alleging that he or she is indigent and is unable to pay a mandatory fine is not automatically entitled to a waiver * * *."  *Id.*  Instead, the defendant has the burden to affirmatively show he is indigent and will be unable to pay the fine in the future.  *Id.*

{¶138}  The following information is in the record regarding Appellant's ability to pay a mandatory fine.  Appellant was indicted on September 3, 2020; he failed to appear for his initial arraignment; and a warrant for his arrest was issued.  It appears Appellant was represented by the public defender's office and later had court-appointed counsel because he was indigent.  However, there is no financial affidavit completed on his behalf indicating whether he had assets or any means of financial support.  The only financial affidavit gleaned from this record was filed *after* Appellant's conviction, and the information section pertaining to Appellant is blank.

{¶139}  On October 16, 2020, the trial court states in part in a judgment entry regarding independent testing of the evidence:

> On October 9, 2020, the Court heard several matters.  * * * The Court grants Defendant permission to engage the services of DNA Diagnostics Center (DDC) * * * for the purpose of retesting the alleged substances involved in this matter. * * * *Due to Defendant's purported indigency*, the State will initially be responsible for paying the associated costs which, if then billed to the Office of the Public Defender, may be reimbursed at the rate of seventy percent (70%).

(Emphasis added.)  There is no explanation or other indication what the court means by "purported indigency," and the transcript of this hearing is not before us.

{¶140}  On December 10, 2020, Appellant moved for "approval of payment" of independent testing of the evidence seized from the camper.  This motion does not reference Appellant's indigency or inability to pay.  (December 10, 2020 Payment Motion.)

Case No. 21 BE 0032

On this same date, Appellant also moved for a "Personal recognizance bond or bond reduction." In this motion, he asserts he failed to appear at his initial arraignment because he was jailed elsewhere. This motion also does not mention Appellant's alleged indigency but does seek a reduction in his bond. (December 10, 2020 Bond Motion.) The court states in an entry it will address the merits of these motions at a hearing scheduled for December 14, 2020, and a subsequent docket entry states the hearing was "Heard and Held." This transcript is not in the record.

{¶141} On February 16, 2021, Appellant via counsel moved the court to approve payment of the court reporter's fees and costs at the public's expense to secure a copy of the suppression hearing transcript. This motion states in part "the defendant is an indigent person and is incarcerated. Indeed, he was qualified for appointed counsel and expert, paid for by the state." (February 16, 2021 Motion for Transcripts.) The court granted this motion the next day without state opposition, stating in part: "The Court Reporter is directed to prepare that transcript and then provide copies to the parties, at the State's expense." (February 17, 2021 Judgment.)

{¶142} Appellant's presentence report does not address indigency, ability to pay, or his work history. It indicates Appellant resided in a recreational camper at the time of his arrest; graduated high school; and appears to have a substantial drug and alcohol problem based on his criminal record. It does not address the ownership of the camper or whether he had any assets or job skills.

{¶143} Appellant directs our attention to *State v. Richey*, 6th Dist. Wood No. WD-19-064, 2020-Ohio-4610, in support of this argument. In *Richey,* the state conceded on appeal that Appellant would have been found indigent had her trial counsel filed the necessary affidavit of indigency. The Sixth District agreed and found the record supported this conclusion, noting Richey was appointed counsel at her initial appearance and her attorney later had his request for court-appointed counsel fees approved. The *Richey* Court also confirmed Richey spent 425 days incarcerated before her sentencing; she had no assets; and she was living with relatives before her arrest. Thus, the court of appeals found counsel was deficient, and it reversed and remanded for the trial court to ascertain whether Richey was indigent and unable to pay the fines as a result. *Id.* at ¶ 9.

**{¶144}** Unlike *Richey*, the Sixth District Court of Appeals in *State v. Beard,* 6th Dist. Sandusky No. S-19-018, 2020-Ohio-3393, ¶ 8-9, found there was no evidence in the record tending to indicate the trial court would have found Beard indigent and unable to pay the mandatory fines. On the contrary, *Beard* recited the following from the record as tending to show he likely <u>had</u> the ability to pay:

> The record shows appellant, a life-long resident of Sandusky, Ohio, was gainfully employed at the time of his arrest, he is 35 years old, has completed five years of college and is set to graduate after he completes 29 hours. He is described as "bright," "hard working," "fair and honest," and "intelligent."

*Id.* at ¶ 8-9.

**{¶145}** In *State v. Banks*, *supra*, the Sixth District found there was not record evidence showing a "reasonable probability that the defendant would have been found indigent * * *." *Id.* at ¶ 17-18. In that case, the only relevant evidence included the trial court's notation the defendant was "middle-aged" and "mentally sound." *Id.* There was nothing tending to show he suffered from any condition preventing him from working and at one point, he sought a continuance to secure a privately retained attorney. This fact tended to show he could pay a fine in the future.

**{¶146}** Based on the record here and case law, the trial court already reached the merits of Appellant's motion to waive the fines and found he likely had the ability to pay the fine. Despite its decision finding him indigent for payment of attorney's fees, it found he will be able to pay the fine sometime in the future. Because of this, we cannot find that "but for counsel's deficient performance, there exists a reasonable probability that the result of the proceeding would have been different," and as such, Appellant fails to satisfy the second ineffective assistance of counsel prong.

**{¶147}** Accordingly, Appellant's sixth assignment of error is overruled.

### Conclusion

**{¶148}** Based on the foregoing, Appellant's assignments of error numbered one through four and six lack merit and are overruled. However, we find the trial court abused its discretion by answering the jury's question in the manner it did, as detailed in

assignment of error number five. Notwithstanding, the error did not result in prejudice and was harmless. The trial court's judgment is affirmed.


Donofrio, P J., concurs.

D'Apolito, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Belmont County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**