# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

CHARLES L. PAYNE II,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 24 CO 0012, 24 CO 0013, 24 CO 0014**

---

Criminal Appeals from the
Columbiana County Municipal Court, Columbiana County, Ohio
Case Nos. 2024 CRB 00001, 2024 CRB 00004, 2024 CRB 00034

**BEFORE:**
Mark A. Hanni, Cheryl L. Waite, Judges,
Andrew J. King, Judge of the Fifth District Court of Appeals,
Sitting by Assignment.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino*, Columbiana County Prosecutor, and *Atty. Jeffrey Jakmides*, Special Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Rhys B. Cartwright-Jones*, for Defendant-Appellant.

Dated: November 25, 2024

**HANNI, J.**

{¶1} Defendant-Appellant, Charles L. Payne II, appeals from Columbiana County Municipal Court judgments convicting him of assault, domestic violence, and aggravated menacing, following a jury trial. Appellant now argues that the prosecutor impermissibly bolstered a witness's testimony, his convictions were not supported by sufficient evidence, and the trial court failed to give a lesser-included offense instruction. Because Appellant's arguments lack merit, the trial court's judgments are affirmed.

{¶2} Amy is married to Appellant. Donna is Amy's mother. Aivars is Amy's stepfather. Tracy is Amy's sister.

{¶3} On December 29, 2023, Amy visited Tracy at her apartment. Later that evening, Amy learned that Appellant was sitting outside of Tracy's apartment. By the time Tracy went out to look for Appellant, he had left. The next day, December 30, Amy asked Appellant why he had been at Tracy's apartment. Appellant and Amy got into an argument, which Amy recorded. During the argument, Appellant threatened to shoot and kill Amy, Tracy, and their family stating, "I'll shoot all you mother fuckers." He also threatened to return to Tracy's apartment that night. Appellant further said "I'm a killer."

{¶4} After the argument, Amy left to pick up her friend's children from their father at McDonald's in Chester, West Virginia. Amy brought her and Appellant's eight-year-old daughter with her. Appellant followed them. Once she stopped in the McDonald's parking lot, Appellant got out of his car and began banging on Amy's car window.

{¶5} Amy left McDonald's, heading to Donna's and Aivars' home. She called Donna on the way and told her that Appellant was following her and she was worried. She also called Appellant's father for help. According to Donna, Amy was scared.

{¶6} When Amy arrived, she and her daughter went into the house. Aivars went outside because he did not want Appellant to come into his home. Appellant pulled into Aivars' driveway and got out of his vehicle. According to Aivars, Appellant appeared to be enraged. Appellant told Aivars that he was there to get his daughter. Aivars told Appellant "no". Appellant then pushed Aivars. Aivars picked up a shovel handle and struck Appellant in the leg when Appellant tried to go towards the house. A struggle

ensued and both men fell to the ground.

**{¶7}** Amy and Donna ran outside. Amy called 911. Once she called 911, Appellant got in his car and left.

**{¶8}** East Palestine Police Lieutenant Donald Johnson responded to the call. Lt. Johnson arrived to find Aivars "frazzled" and holding his hand, which was bleeding. He spoke to Amy, Aivars, and Donna and listened to the recording of Appellant's threats. As a result of his investigation, Lt. Johnson charged Appellant with assault.

**{¶9}** Later that day, on the advice of Lt. Johnson, Amy and Tracy went to the East Liverpool Police Station to file reports of the events that transpired in East Liverpool, where Tracy's apartment was. East Liverpool Patrolman Justin Watkins took their statements. Amy also played the recording of Appellant's threats for the patrolman. Based on the information Amy and Tracy provided, Patrolman Watkins filed charges against Appellant for domestic violence for the threat against Amy and for aggravated menacing for the threat against Tracy.

**{¶10}** The charges were each assigned their own separate case number: Case No. 24CRB01, assault, a first-degree misdemeanor in violation of R.C. 2903.13(A); Case No. 24CRB04, domestic violence, a fourth-degree misdemeanor in violation of R.C. 2919.25(C); and Case No. 24CRB34, aggravated menacing, a first-degree misdemeanor in violation of R.C. 2903.21.

**{¶11}** The cases were all heard together at a jury trial on March 27, 2024. The jury found Appellant guilty as charged. The trial court subsequently sentenced Appellant as follows.

**{¶12}** On the domestic violence conviction, the court sentenced Appellant to 30 days in jail, 19 days suspended, and a $250 fine. On the assault conviction, the court sentenced Appellant to 180 days in jail, 169 days suspended, and a $250 fine. And on the aggravated menacing conviction, the court sentenced Appellant to 180 days in jail, 169 days suspended. The court ordered Appellant to serve his sentences concurrently for a total of 180 days, 169 days suspended.

**{¶13}** Appellant filed timely notices of appeal on April 22, 2024. Noting that the underlying case numbers were tried together, this Court consolidated the three cases for purposes of this appeal. Appellant now raises three assignments of error for our review.

Case Nos. 24 CO 0012, 24 CO 0013, 24 CO 0014

**{¶14}** Appellant's first assignment of error states:

THE TRIAL COURT ERRED IN DENYING THE DEFENSE'S REQUEST FOR A MISTRIAL DUE TO IMPROPER LAW ENFORCEMENT BOLSTERING OF WITNESS TESTIMONY.

**{¶15}** Lieutenant Donald Johnson responded to the 911 call. Appellant took issue with two statements by Lt. Johnson that he claims bolstered Aivars' testimony.

**{¶16}** The first statement occurred while the prosecutor was trying to clarify where the events in question took place. Lt. Johnson testified as to events that occurred in three different locations: East Liverpool, Ohio; Chester, West Virginia; and East Palestine, Ohio. In clarifying where the assault charge arose and what incident he specifically dealt with, Lt. Johnson testified: "An assault definitely occurred in East Palestine." (Tr. 50). The trial court overruled defense counsel's objection. But on cross-examination, defense counsel clarified the issue:

> Q. I have a couple questions for you that - - you heard me object over there when there was that question about the assault definitely occurring in East Palestine, and I wanted to clear that up for the jurors understanding. What you mean by that is jurisdictionally, geographically, whatever that incident was, that scenario occurred geographically in East Palestine; is that fair to say?
>
> A. Yes.
>
> Q. As a police officer, you may file charges, but you don't make the ultimate determination of whether a crime occurred, you just file a charge; correct?
>
> A. (No response.)
>
> Q. You file the charge and then we go to court?
>
> A. If - - as long as I think there is enough evidence to file the charge, yes.

Case Nos. 24 CO 0012, 24 CO 0013, 24 CO 0014

Q.  Probable cause?

A.  Right.

Q.  Right.  Not proof beyond a reasonable doubt.  I just want to make sure that what - - when you mean - - when you were talking about that definiteness that I objected to, was - - that was when you were talking about where the locations are.  Was it over in East Liverpool, was it over in East Palestine.  That is what you are talking about as - - that whatever that incident was and thing that you were going to charge, which was assault, geographically occurred in East Palestine; right?

A.  Yeah.

(Tr. 52-53).  Thus, the issue was clarified that Lt. Johnson was simply testifying as to the jurisdiction where the events at issue took place.

{¶17}  The second statement Appellant takes issue with occurred during re-direct examination of Lt. Johnson by the prosecutor.  It followed defense counsel's questions on cross-examination regarding the fact that Lt. Johnson was not present at the scene when the alleged assault occurred.  Consequently, most of his testimony was based on his "understanding" of the situation.  Defense counsel made a point to emphasize that Lt. Johnson did not have firsthand knowledge of the situation.  (Tr. 54-55).

{¶18}  On re-direct examination, the prosecutor asked Lt. Johnson what his impression was of Aivars based on his experience.  (Tr. 55).  Defense counsel objected. (Tr. 55).  The prosecutor argued that defense counsel opened the door to this question. (Tr. 55).  The trial court overruled the objection.  (Tr. 55).  The lieutenant answered:  "He was absolutely truthful."  (Tr. 56).  Defense counsel then moved for a mistrial, which the court overruled.  (Tr. 56).

{¶19}  Appellant now argues the trial court abused its discretion in denying his request for a mistrial.  He claims that the prosecution's bolstering of Aivars' testimony deprived him of a fair trial.  Appellant asserts the prosecutor steered the jury towards a presumption that Aivars was truthful.

{¶20}  A trial court is afforded broad discretion upon considering a motion for a

mistrial. *State v. Schiebel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. Therefore, we review that decision for an abuse of discretion. *Id.* Abuse of discretion connotes more than an error of judgment; it implies the trial court's attitude is arbitrary, unreasonable, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

> A mistrial is appropriate when the substantial rights of the accused or prosecution are adversely affected making a fair trial no longer possible. *Illinois v. Somerville*, 410 U.S. 458, 462-463, 93 S.Ct. 1066 (1973); *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). The decision to grant a mistrial "is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice." *State v. Jones*, 83 Ohio App.3d 723, 615 N.E.2d 713 (2d Dist.1992).

*State v. Cutlip*, 2022-Ohio-3524, ¶ 59 (7th Dist.), appeal not allowed, 2023-Ohio-212.

{¶21} Appellant relies on the case of *State v. Loyd*, 2021-Ohio-4508 (6th Dist.), for support. In *Loyd*, during the defendant's trial for felonious assault, the victim and the defendant each testified as to very different versions of what occurred. A disinterested witness's testimony largely corroborated the victim's testimony. During the cross-examination of the defendant, while holding several papers in his hand, the prosecutor asked the defendant: "What if I told you that there are other written statements that corroborate Mr. Castro [disinterested witness]. Would they be lying?" *Id.* at ¶ 7. Defense counsel objected and moved for a mistrial. The trial court denied the motion but gave the jury a curative instruction. Later, the jury sent a question to the court asking if there were any more eyewitness statements to corroborate Mr. Castro's statement. Defense counsel again moved for a mistrial, citing the fact that the jury had not adhered to the court's cautionary instruction. The trial court denied the motion. The jury found the defendant guilty.

{¶22} On appeal, the defendant argued that the prosecutor, during his cross-examination of the defendant, improperly vouched for the testimonies of the victim and witness Castro. *Id.* at ¶ 10. The appeals court described vouching:

"Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." [*State v.*] *Davis* [, 2008-Ohio-2] at ¶ 232, citing *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117. The law is clear that "[i]t is improper for a prosecutor to vouch for the credibility of a witness at trial." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 96.

*Id.* at ¶ 10. The court then agreed with the defendant and the trial court that the state improperly vouched for the victim's credibility by implying knowledge of evidence outside the record which supported her version of events. *Id.* at ¶ 11. The appeals court further found that the jury's failure to disregard the state's prejudicial conduct, despite being instructed by the trial court that the conduct was not evidentiary and could not be considered, denied the defendant a fair trial. *Id.* at ¶ 12.

**{¶23}** This case is distinguishable from *Loyd* on its facts. First, in *Loyd*, the witnesses gave conflicting testimony of what occurred. The appellant in that case testified in her defense. In this case, however, Appellant did not testify to offer an alternative version of the events. Second, the jury here did not ask the court to clarify Lt. Johnson's testimony or ask if there was corroborating evidence as the jury did in *Loyd*. Thus, there was no indication that they were looking for other evidence as to any witness's credibility as was the case in *Loyd*.

**{¶24}** In analyzing a rape case where a witness vouched for the victim's veracity, this Court noted:

[S]everal courts have held that improper vouching as to a victim's credibility is harmless if the victim testifies and is subject to cross-examination. While having a witness testify the victim is telling the truth is error, it is harmless error if the victim testifies and is subject to cross-examination, there is medical evidence indicating abuse, and the testimony is cumulative to other evidence. *State v. Thompson*, 4th Dist. Washington No. 06CA28, 2007-Ohio-5419, 2007 WL 2938166, ¶ 53; *accord State v. Hupp*, 3rd Dist. Allen No. 1-08-21, 2009-Ohio-1912, 2009 WL 1110601, ¶ 20. "When the victim testifies, the jury is able to hear the victim's answers, witness her demeanor

and judge her credibility completely independent of the other's testimony concerning the veracity of the victim." *Id.*

These courts rationalized that because the jury was able to perceive the witness and decide the credibility of the alleged victim for themselves, the improper vouching testimony was rendered harmless. *See State v. Smith*, 12th Dist. Butler No. CA2004-02-039, 2005-Ohio-63, 2005 WL 39670, ¶ 22-24; *State v. Morrison*, 9th Dist. Summit No. 21687, 2004-Ohio-2669, 2004 WL 1161415, ¶ 62-66; *State v. Reid*, 8th Dist. Cuyahoga No. 83206, 2004-Ohio-2018, 2004 WL 859172, ¶ 35-36.

*State v. Herns*, 2023-Ohio-4714, ¶ 62-63 (7th Dist.), appeal not allowed, 2024-Ohio-1228.

**{¶25}** Following this logic, it is significant here that Aivars testified. The jury was able to listen to him to and observe his direct testimony and cross-examination. It was able to observe Aivars' demeanor and body language. The jurors were then able to make their own credibility determination based on their personal observations. Given these circumstances, any error here is harmless.

**{¶26}** Accordingly, Appellant's first assignment of error is without merit and is overruled.

**{¶27}** Appellant's second assignment of error states:

THE TRIAL COURT ERRED IN ALLOWING ONE OR MORE CONVICTIONS IN LIGHT OF INSUFFICIENT EVIDENCE.

**{¶28}** Here, Appellant contends that each of his three convictions was not supported by sufficient evidence. We will address each conviction separately.

**{¶29}** Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Dickson*, 2013-Ohio-5293, ¶ 10 (7th Dist.), citing *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). Sufficiency is a test of adequacy. *Id.* Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have

found the essential elements proven beyond a reasonable doubt. *Id.*, citing *State v. Goff*, 82 Ohio St.3d 123, 138 (1998). When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273 (1991) (superseded by state constitutional amendment on other grounds).

**{¶30}** When reviewing a sufficiency challenge, the court does not evaluate witness credibility. *State v. Yarbrough*, 2002-Ohio-2126, ¶ 79. Instead, the court looks at whether the evidence is sufficient if believed. *Id.* at ¶ 82.

**{¶31}** In examining a sufficiency challenge, we must examine all of the evidence put forth by the State.

**{¶32}** Amy testified that on December 29, 2023, after she left her sister Tracy's apartment, she learned that Appellant was outside of Tracy's apartment. (Tr. 81). The next day, Amy asked Appellant why he had been at Tracy's apartment. (Tr. 82). Amy recorded her conversation with Appellant and the recording was played for the jury. (Tr. 82). In the recording, Appellant threatened to shoot and kill Amy, Tracy, and their family. Amy played this recording for Tracy. (Tr. 84-85). Tracy was upset and crying. (Tr. 85). Amy stated, however, that she was not fearful for herself and she thought Appellant sounded "ridiculous." (Tr. 85).

**{¶33}** Amy then went to pick up her friend's children from their father in Chester, West Virginia. (Tr. 85). She was to meet them at McDonald's. (Tr. 85). Amy had her and Appellant's eight-year-old daughter in the car with her. (Tr. 85-86). Appellant followed Amy to McDonald's. (Tr. 85). Amy stated that she was not in a good mental state at the time. (Tr. 86). She then claimed she had been suffering from a poor mental state so that she did not remember what she reported to the police. (Tr. 89). Amy admitted that in her police report, she told the police that Appellant made death threats against her and her family and she was in fear. (Tr. 91-93, 94). But in her testimony, Amy stated that she was not afraid of Appellant. (Tr. 93). Amy also admitted that she told the police that Appellant had been following close behind her. (Tr. 94). And she reported that when she stopped at McDonald's, Appellant banged on her window so hard she thought he was going to break it. (Tr. 94).

**{¶34}** Amy testified that she then left McDonald's and headed to her mother's

house. (Tr. 94). On her way, she called her mother and told her Appellant was following her. (Tr. 94). She also called Appellant's father because she believed his father could help her get some distance from Appellant. (Tr. 94-95). Appellant followed Amy to her mother's house. (Tr. 95).

{¶35} When Amy arrived, she and her daughter went into the house. (Tr. 96). She exited her car in such a hurry that she left the engine running. (Tr. 96-97). Amy stated she was fearful Appellant was going to take their daughter. (Tr. 97). She then heard a noise outside. (Tr. 97). Amy admitted that she told the police that she saw Appellant attacking her stepfather, Aivars, who was trying to prevent Appellant from coming inside. (Tr. 97-98). Amy stated that she called 911. (Tr. 99). Once she called 911, Amy testified that Appellant got in his car and left. (Tr. 101).

{¶36} William met Amy at McDonald's on December 30, 2023, so that Amy could bring his children with her to their mother's house. William testified that he and his children were sitting in their car waiting for Amy when William saw Amy's car pull into the parking lot with an SUV "flying up" after. (Tr. 104-105). He stated Appellant was driving the SUV. (Tr. 105). After they pulled in, William saw Appellant jump out of his vehicle and begin beating on Amy's car window. (Tr. 105). William testified that because of this, he did not allow his children to get out of his car and he left with them. (Tr. 105-106).

{¶37} Amy's sister Tracy testified next. She stated that during the evening of December 29, 2023, she noticed a flashlight shining in her backyard and then saw Appellant sitting in his vehicle outside. (Tr. 110-111). When Tracy looked again, Appellant had left. (Tr. 111). Tracy testified that the next day, Amy played a recording for her of Appellant threatening to shoot and kill Amy, Tracy, and their family. (Tr. 112-113). Tracy stated she was scared for herself and scared for her sister. (Tr. 113-115). She testified that she felt that she was in danger especially given the fact Appellant said he was coming back to her apartment. (Tr. 114). Tracy stated, however, that she was not scared while she was at the police station. (Tr. 114).

{¶38} Patrolman Justin Watkins took Amy's and Tracy's statements at the police station on December 30, 2023. Patrolman Watkins testified that Amy reported a domestic dispute and played the recording of Appellant threatening her and her family. (Tr. 118-119). Amy told the patrolman that Appellant had scared her and she was very fearful.

(Tr. 119). He testified that Tracy was very upset too. (Tr. 120). Amy also relayed the incident at McDonald's for Patrolman Watkins. (Tr. 119-120). Based on the information from the two women, Patrolman Watkins filed charges against Appellant for domestic violence for the threat against Amy and for aggravated menacing for the threat against Tracy. (Tr. 120-121).

{¶39} Lt. Johnson testified that he responded to a 911 call for assistance on December 30, 2023. (Tr. 43). When he arrived, Lt. Johnson first spoke with Aivars who was "frazzled" and holding his hand, with a napkin around it that had blood on it. (Tr. 43). After interviewing Aivars, Amy, and Donna, and hearing the recording of the threats by Appellant, Lt. Johnson learned the events that had led up to the altercation preceding the 911 call. (Tr. 46-47). As a result of his investigation, Lt. Johnson charged Appellant with assault. (Tr. 51).

{¶40} Aivars testified next. He stated that on the day in question, his step-daughter Amy came to his home with her daughter because she was worried about Appellant "coming after her." (Tr. 63). Aivars went outside because he did not want Appellant to come inside his home. (Tr. 64). Appellant pulled into Aivars' driveway and got out of his vehicle. (Tr. 64). Aivars stated that Appellant had an "enraged" look on his face. (Tr. 65). Appellant told Aivars that he was there to get his daughter. (Tr. 65). When Aivars told Appellant "no," Appellant pushed Aivars. (Tr. 65). Aivars picked up "an old shovel handle" and when Appellant attempted to go to the sidewalk into Aivars home, Aivars struck Appellant in the leg. (Tr. 65). A struggle then ensued with Aivars trying to keep Appellant from entering his home where Amy, her daughter, and Donna were. (Tr. 65). Appellant and Aivars both ended up falling down into the mulch. (Tr. 65). Aivars testified that Amy and Donna ran outside. (Tr. 65). He stated that when Appellant heard Amy call 911, Appellant left. (Tr. 65). Aivars stated that he scraped his hand when they fell. (Tr. 65).

{¶41} Donna testified that she ran outside when she heard the "scuffle." (Tr. 75). She saw Appellant "coming at" Aivars. (Tr. 75). Donna testified that Appellant looked angry and he was trying to get into their home. (Tr. 75). She also testified that Amy was "very scared." (Tr. 76).

{¶42} First, Appellant contends his domestic violence conviction was not

supported by sufficient evidence because Amy testified she did not fear him and was not in fear of imminent physical harm from him. He notes that Amy found his threats not credible.

**{¶43}** The jury convicted Appellant of domestic violence in violation of R.C. 2919.25(C), which provides: "No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member."

**{¶44}** The State put forth sufficient evidence as to the elements of domestic violence.

**{¶45}** Patrolman Watkins testified that Amy and Tracy came to the police station to file a report. Amy reported a domestic dispute to the patrolman and played the recording of Appellant threatening to shoot and kill her and her family. She told Patrolman Watkins that Appellant scared her and she was very fearful. Additionally, Donna testified that when Amy arrived at her house, she was "very scared."

**{¶46}** Moreover, the circumstances leading up to Amy filing the police report corroborate her statement that she was fearful that Appellant would cause her imminent physical harm. Appellant went to Amy's sister's house and waited outside for some time. He then threatened to shoot and kill Amy, Tracy, and their family. Appellant then followed Amy to a McDonald's where he banged on her window so hard she feared he would break it. He did this with their daughter in the car. Amy became so distraught, she called Appellant's father for help. She then went to her mother's house and arrived "very scared" with Appellant following her.

**{¶47}** This evidence was sufficient to show that Appellant, by his threats and behavior, caused Amy, his wife, to believe that he would cause her imminent physical harm. Amy tried to take back her prior words and actions at trial, stating that she was not fearful of Appellant and she thought his threats were "ridiculous." But that testimony does not take away from the fact that the State presented evidence going to the elements of causing a family member to believe that the offender will cause imminent physical harm to them. Instead, Amy's conflicting testimony created an issue of credibility for the jury to determine.

**{¶48}** Second, Appellant contends his aggravated menacing conviction was not

supported by sufficient evidence. Appellant argues Tracy's testimony lacked any indication of apprehension of serious physical harm because she stated she was not frightened while she was at the police station.

**{¶49}** The jury convicted Appellant of aggravated menacing in violation of R.C. 2903.21(A), which provides in pertinent part: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . or a member of the other person's immediate family."

**{¶50}** The State put forth sufficient evidence as to the elements of aggravated menacing.

**{¶51}** The evidence demonstrated that Appellant showed up at Tracy's apartment and sat outside on the evening of December 29, 2023. The next day, in a recorded argument with Amy, Appellant stated that he was going shoot and kill Amy, Tracy, and their family. He stated he would go back to Tracy's apartment. Tracy testified she was scared for herself and scared for her sister. She felt that she was in danger especially given the fact Appellant said he was coming back to her apartment.

**{¶52}** Appellant relies on one statement by Tracy that she was not scared. But she clarified that statement by stating that she was not scared "at that particular moment at the police department." (Tr. 114).

**{¶53}** The evidence was sufficient to show that Appellant, by his threats and behavior, caused Tracy to believe that he would cause her, or a member of her family, serious physical harm.

**{¶54}** Finally, Appellant contends his assault conviction was not supported by sufficient evidence. He asserts that the testimony described a physical scuffle between two men that ended with them both slipping and falling to the ground.

**{¶55}** The jury convicted Appellant of assault in violation of R.C. 2903.13(A), which provides in relevant part: "No person shall knowingly cause or attempt to cause physical harm to another[.]" R.C. 2903.01(A)(3) defines "physical harm" to a person as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."

**{¶56}** The State put forth sufficient evidence as to the elements of assault. Aivars testified that when Appellant got out of his car he looked enraged. Appellant told Aivars that he was there to get his daughter to which Aivars told Appellant "no." Appellant then

pushed Aivars. That testimony that Appellant pushed Aivars was sufficient to prove the elements of assault, namely that Appellant attempted to cause physical harm to Aivars. Whatever type of "scuffle" that ensued after does not detract from the fact that the State put forth evidence that Appellant knowingly caused or attempted to cause physical harm to Aivars.

**{¶57}** Accordingly, Appellant's second assignment of error is without merit and is overruled.

**{¶58}** Appellant's third assignment of error states:

WHEN ONE COMBINES THE ABOVE ASSIGNMENTS OF ERROR, ONE'S TRUST IN THE VERDICT IS UNDERMINED SUCH THAT THE CUMULATIVITY OF ERROR DEMANDS REVERSAL.

**{¶59}** In his last assignment of error, Appellant re-asserts his arguments regarding the improper bolstering of Aivars' testimony. He then raises a new issue.

**{¶60}** Appellant argues that the trial court erred in failing to give a lesser-included offense instruction as to the aggravated menacing and domestic violence charges. Appellant argues the court should have granted his request to include an instruction on the lesser-included offense of disorderly conduct.

**{¶61}** Appellant requested a lesser-included offense instruction on all three charges. (Tr. 138-139). The trial court granted Appellant's request as to the assault charge but denied it as to the aggravated menacing and domestic violence charges. (Tr. 141-142).

**{¶62}** In *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph three of the syllabus, the Ohio Supreme Court set out the test used to determine whether one offense constitutes a lesser included offense of another:

An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the

Case Nos. 24 CO 0012, 24 CO 0013, 24 CO 0014

greater offense is not required to prove the commission of the lesser offense.

**{¶63}** A lesser-included offense instruction is warranted where the evidence would reasonably support an acquittal on the crime charged and a conviction on the lesser-included offense. *State v. Carter*, 2000-Ohio-172.

**{¶64}** Thus, we must consider whether disorderly conduct is a lesser-included offense of aggravated menacing and of domestic violence and, if so, whether the evidence in this case would reasonably support an acquittal on aggravated menacing and/or domestic violence and convictions on disorderly conduct.

**{¶65}** Disorderly conduct in violation of R.C. 2917.11(A)(1) has been held to be a lesser-included offense of aggravated menacing in violation of R.C. 2903.21(A). *State v. Peel*, 2022-Ohio-362, ¶ 12 (1st Dist.). This court has recognized that. *State v. Poppelriter*, 2015-Ohio-4822, ¶ 31, fn. 1 (7th Dist.).

**{¶66}** But in this case, the evidence did not reasonably support an acquittal on the aggravated menacing charge and a conviction on disorderly conduct.

**{¶67}** R.C. 2917.11(A)(1), the disorderly conduct statute, provides: "No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following: (1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior[.]"

**{¶68}** In contrast R.C. 2903.21(A), the aggravated menacing statute, provides: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family."

**{¶69}** Significantly, the aggravated menacing statute requires that the offender acted *knowingly* while the disorderly conduct statute only requires that the offender acted *recklessly*. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). But "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(A).

Case Nos. 24 CO 0012, 24 CO 0013, 24 CO 0014

{¶70} In this case, the evidence was clear that Appellant acted knowingly as opposed to recklessly. The recording was played for the jury where Appellant threatened to shoot and kill Amy, Tracy, and their family stating, "I'll shoot all you mother fuckers." This came the day after he was lurking outside of Tracy's apartment. He also threatened to return to Tracy's apartment later that night, stating "I'm a killer." When Amy told Appellant that he had scared Tracy, he responded "Good, I hope she is scared to death. I'll go scare her again tonight." These statements clearly indicate that Appellant acted knowingly in making these threats as opposed to acting recklessly. Moreover, the disorderly conduct statute only requires that the offender "cause inconvenience, annoyance, or alarm to another." The aggravated menacing statute, however, requires that the offender "cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family." Here, the evidence was clear that Tracy was scared for her life and for her sister Amy's life. There was no evidence that she was merely inconvenienced, annoyed, or alarmed.

{¶71} Thus, the trial court properly ruled to exclude the lesser-included offense instruction on the aggravated menacing charge.

{¶72} As to the domestic violence charge, this Court, while recognizing a split in the districts on this issue, has ruled that disorderly conduct is not a lesser included offense of domestic violence. *State v. Alvey*, 2003-Ohio-7006 (7th Dist.).

{¶73} Moreover, even if we were to determine that disorderly conduct is a lesser-included offense of domestic violence, the evidence did not support such an instruction. The statutory provision that Appellant was convicted of provides: "No person, by threat of force, shall knowingly cause a family or household member to believe that the offender will cause imminent physical harm to the family or household member." R.C. 2919.25(C).

{¶74} The same analysis applies here as it did to aggravated menacing. The evidence demonstrated that Appellant acted knowingly. Appellant directly threatened to kill Amy and her family. Appellant followed Amy and pounded on her car window. Amy called Appellant's father for help. She called her mother as she fled from Appellant to her mother's house. Amy called 911 when Appellant was at her mother and stepfather's home. This evidence shows that Appellant acted knowingly as opposed to recklessly.

{¶75} Thus, the trial court properly ruled to exclude the lesser-included offense instruction on the domestic violence charge.

{¶76} Finally, we must address Appellant's argument that the alleged errors in this case amount to reversible, cumulative error.

{¶77} An appellate court may reverse a defendant's conviction based on the doctrine of cumulative error. Cumulative error occurs when errors deemed separately harmless deny the defendant a fair trial. *State v. DeMarco*, 31 Ohio St.3d 191 (1987), at paragraph two of the syllabus.

{¶78} But multiple errors do not exist in this case. Therefore, cumulative error cannot exist.

{¶79} Accordingly, Appellant's third assignment of error is without merit and is overruled.

{¶80} For the reasons stated above, the trial court's judgments are hereby affirmed.

Waite, J., concurs.

King, J., concurs.

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgments of the Columbiana County Municipal Court, Columbiana County, Ohio, are affirmed. Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**